**CHATFIELD et al.**

v.

**FARM BUREAU MUT. AUTO. INS. CO.**

**No. 6626.**

United States Court of Appeals, Fourth Circuit.

Argued Oct. 15, 1953.

Decided Nov. 10, 1953.

---

3. "Additional Memo by Appellant", p. 1.

4. Title 48 U.S.C.A. § 234.

C. Woodrow Teague and Thomas A. Banks, Raleigh, N. C. (Hubert H. Senter, Franklinton, N. C., William Y. Bickett, I. Edward Johnson, Charles W. Barbee, Jr., Grady S. Patterson, Jr., Leon S. Brassfield, Armistead J. Maupin, Robert Ruark, J. C. Moore, Raleigh, N. C., Hill Yarborough and E. F. Yarborough, Louisburg, N. C., on the brief), for appellants.

John H. Anderson, Jr., and Willis Smith, Jr., Raleigh, N. C. (Oscar Leach and J. K. Dorsett, Raleigh, N. C., on the brief), for appellee.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

Farm Bureau Mutual Automobile Insurance Company (hereinafter called Insurer) brought a civil action in the United States District Court for the Eastern District of North Carolina, seeking a declaratory judgment as to its liability under an automobile liability insurance policy issued to C. A. Payne, as "named insured," on his 1947 Chevrolet. In this action it was necessary to determine whether or not the "actual use" of this automobile, which was being driven by Raymond Chatfield at the time it was involved in a collision on September 12, 1951, was with the "permission" of Payne within the meaning of the "omnibus clause" of the insurance policy. The policy provided that its provisions would be extended to "any person while using the automobile * * * provided the actual use of the automobile is by the named insured or with his permission."

The defendants in this action are the driver of Payne's automobile, Chatfield, and the persons who instituted civil actions against Chatfield and others for the death of a child riding in Payne's car and the deaths of two passengers in the other car involved in the collision.

The District Judge submitted to the jury the following question: "Was Raymond Chatfield at the time of the collision driving the insured automobile with the permission, either express or implied, of the named insured or anyone having authority to bind him in that regard?"

At the close of all the evidence, the court being of the opinion that the jury should be directed to answer the issue "No" and in favor of the plaintiff, and having directed the jury to so answer said issue, as appears in the record, and the jury having answered the same as directed by the court, it was thereupon adjudged and decreed by the District Court:

" * * * said defendant Chatfield was not operating or using said automobile with the permission of C. A. Payne, and said Raymond E. Chatfield was therefore not 'an insured' with respect to the insurance for bodily injury liability or for property damage liability afforded and provided by Policy No. R–931–433B issued by the plaintiff to said C. A. Payne with respect to the aforesaid 1947 Chevrolet automobile."

From this judgment, defendants have appealed to us.

The only issue we consider on this appeal is whether the District Judge erred in directing, as a matter of law, a verdict for the plaintiff. We think he did err and that the question of "permissive use" by Chatfield of Payne's automobile, within the coverage of plaintiff's insurance policy, should have been submitted to the jury under proper instructions. We must, therefore, remand the case for a new trial.

The facets of this case are many and varied. We must outline in some detail the facts and background which the evidence tended to prove. This factual set-up is extensive and complicated.

Mr. and Mrs. C. A. Payne lived in Franklinton, North Carolina, where for several years prior to September 11, 1951, they jointly owned and operated a motion picture theatre. Adjoining the theatre is a building in which there is a cafe, also jointly owned by Mr. and Mrs. Payne and operated by their daughter, Mrs. W. A. Hardy and other members of the Payne family. The second floor of this cafe was occupied as living quarters of Mr. and Mrs. Payne, their daughter and her husband (Mr. and Mrs. Hardy), their granddaughter and her husband (Mr. and Mrs. Raymond Eugene Chatfield) and several minor children of the Hardys and Chatfields.

In connection with Mr. and Mrs. Payne's theatre was a bank account in the name of "The Franklinton Theatre" on which both Mr. and Mrs. Payne had authority to draw checks and make deposits. As of September 11, 1951, the only employees of the theatre other than Mr. and Mrs. Payne were: Rufus Catlett who operated the projection machine; a popcorn boy, and Raymond Chatfield. Subsequently, in the absence of Mr. Payne, Mrs. Payne employed an unidentified girl to work at the theatre. Mr. Payne usually took up the tickets; Mrs. Payne usually sold the tickets and made bank deposits; Catlett's only duty was to operate the projection machine; the duty of the popcorn boy was to sell popcorn; and Chatfield's duties were not limited to any one task.

Payne owned a 1947 Chevrolet automobile; Mrs. Hardy owned a 1948 Studebaker automobile for her own use; and she purchased a 1941 Studebaker to be used generally in the delivery of food for the cafe and for the further personal use of her son-in-law, Chatfield. The keys to this 1941 Studebaker were kept hanging on a nail in the cafe. Mrs. Payne could not operate an automobile. On at least one occasion prior to September 11, 1951, Payne had given his specific permission for Chatfield to operate this 1947 Chevrolet automobile, on which occasion Chatfield and his wife went to Carolina Beach for a five day vacation.

On September 11, 1951, Payne was stricken with a heart attack and was taken by ambulance to Rex Hospital, Raleigh, North Carolina. The Chevrolet was parked back of the apartment, where it was generally kept when not in use. Its keys were left in the pocket of Payne's clothes, lying on a chair in his bedroom. Mrs. Payne placed these keys in her handbag for safe keeping. Payne's condition was apparently such that he was unable to give any specific instructions of any kind regarding his personal or his business affairs.

The following day, September 12, 1951, when Catlett, the projectionist, was off duty, Mrs. Payne was preparing to visit her stricken husband and, unable to drive, she got Mrs. Hardy to drive her to Raleigh in Mrs. Hardy's

Studebaker. Just before leaving for the hospital, Mrs. Payne asked Chatfield if he would like to accompany her and Mrs. Hardy to visit Payne. Chatfield replied in the negative, saying he had to go to Wake Forest, North Carolina, to obtain an electrical switch for the projection machine. Mrs. Payne asked Chatfield if he would like to drive Payne's Chevrolet, and Chatfield said that it did not make any difference. Mrs. Payne removed the keys to the Chevrolet from her handbag and handed them to Chatfield.

Chatfield, accompanied by his wife, drove Payne's Chevrolet to Wake Forest, about nine miles south of Franklinton. Mrs. Payne testified at the trial that she saw Mr. and Mrs. Chatfield in the Chevrolet and that she did not object.

Chatfield was unable to locate the man in Wake Forest, a Mr. Arrington, from whom he had hoped to obtain the switch for the projection machine so he returned to Franklinton without having accomplished anything toward the repair of the machine. Chatfield had never operated the projection machine in its then state of disrepair. Upon their return to Franklinton, Mr. and Mrs. Chatfield found that Mrs. Hardy and Mrs. Payne had not returned from their visit to Mr. Payne.

Chatfield, then, with the youngest Chatfield child and the minor child of Mrs. Hardy, drove the Chevrolet to a cabin not far from Franklinton, where Chatfield found the regular projectionist, who was cooking barbecue.

Chatfield repeated several times in his testimony that he did not go to the cabin for the purpose of seeing Catlett and, when he started the trip to the cabin, he (Chatfield) did not know that Catlett would be at the cabin. Chatfield and Catlett there talked about twenty minutes, but, according to the testimony of both, nothing was said about the defective switch, the motion-picture business or even the illness of Payne, their employer. Catlett also testified that on the night of September 12, 1951, as well as on previous occasions, he operated the projection machine with the master switch, without using the defective switch which had given rise to Chatfield's trip to Wake Forest. Chatfield testified, though, that when he started the trip to the cabin, he had expected to operate the projector that night.

On the way back from the cabin to Franklinton, the Chevrolet, driven by Chatfield, collided with the deBaun automobile, causing the deaths, personal injuries and property damage that form the basis of the civil actions against Chatfield and C. A. Payne, which are still pending.

There is no evidence in the record that Payne had *expressly* authorized Mrs. Payne to permit any one to drive the Chevrolet while he was in the hospital. The policy in question stated: "The purposes for which the automobile is to be used are Business and Pleasure."

This case is governed by the law of North Carolina. The legislative trend in this direction is indicated by North Carolina General Statutes, § 20–227(2)(b) requiring, under the "Motor Vehicle Safety and Financial Responsibility Act," that every owner's policy shall:

"Insure as insured the person named, and any other person using or responsible for the use of the motor vehicle with the permission, expressed or implied, of the named insured, or any other person in lawful possession".

And Chapter 494 of the 1951 Session Laws of North Carolina provides:

"G.S. 20–71.1. Registration evidence of ownership; ownership evidence of defendant's responsibility for conduct of operation. (a) In all actions to recover damages for injury to the person or to property or for the death of a person, arising out of an accident or collision involving a motor vehicle, proof of ownership of such motor vehicle at the time of such accident or collision shall be prima facie evidence that said motor vehicle was being operated and used with the authori-

ty, consent, and knowledge of the owner in the very transaction out of which said injury or cause of action arose."

The cases in this field are literally legion. They are helpful, yet each case stands more or less on its peculiar facts. We consider first the North Carolina cases.

Diligent counsel, and our own independent research, have disclosed only two North Carolina cases dealing with the so-called "omnibus clause." The earlier of these cases, MacClure v. Accident & Casualty Insurance Co., etc., 229 N.C. 305, 49 S.E.2d 742, affords us little help. In the opinion, 49 S.E.2d at page 744, it was expressly stated:

"At the time of the injury the offending automobile was being driven on the streets of Asheville by William F. Spence, a member of the show personnel, with the permission of the owner, Delph."

Hooper v. Maryland Casualty Co., 233 N.C. 154, 63 S.E.2d 128, is more closely in point. Justice Ervin, in the first paragraph of his opinion, 63 S.E.2d at page 130, stated:

"Diligent research by counsel and the court fails to uncover any North Carolina decision directly pertinent to the problems posed by the plaintiff's appeal. Since the present record makes these problems so fundamentally factual in nature, however, there is no occasion at this time for us to choose between the differing constructions put upon such clauses by other courts, or to mark out for ourselves the precise legal boundaries of the clause embodied in the policy in suit.

From the opinion in this case, we quote two other extracts, 63 S.E.2d at pages 129 and 132:

"Robert H. Glenn was employed by the Pine Hall Brick and Pipe Company as the regular driver of the Chevrolet truck, which he was allowed to keep at his home in Winston-Salem during the work-week to facilitate his going to work. He 'was given permission to take the truck to his home on the night before the accident * * * for his convenience in making an early start to get a load of brick at Pine Hall the next morning.'

"At sometime between 4:00 and 4:30 o'clock on the morning of February 15, 1947, Glenn was driving the Chevrolet truck, which was empty, along the Whitfield Road. The plaintiff was riding with him. Glenn suddenly lost control of the truck and ran off the road, inflicting disabling and lasting personal injuries upon the plaintiff.

\* \* \* \* \* \*

"The Pine Hall Brick and Pipe Company entrusted the truck to Glenn for a strictly business purpose. There is not a word in the record to indicate that he used it for any other purpose before the morning of the accident, or that his employer knew that he was using it at all on that occasion. These things being true, the testimony offers no basis for an inference that the Pine Hall Brick and Pipe Company had impliedly extended to Glenn permission to use the truck for his own convenience and that of the plaintiff."

A non-suit in favor of the defendant-insurer was affirmed.

While the Hooper case reflects a trend on the part of the North Carolina Courts, and merits our careful consideration, we do not think it controls our decision in the instant case, which presented a widely different factual situation.

This "omnibus clause" has frequently been before us. We consider, briefly, three of these cases which we have decided. In Harrison v. Carroll, 4 Cir., 139 F.2d 427, 428, 429, Judge Soper stated:

"Mrs. Harrison and her son lived on a farm near Reidsville, North Carolina. As was her custom on Sundays, she loaned her automobile on the day of the accident to her

son who was nineteen years of age and who invited three other boys to ride with him, one of whom was Robert Going. They drove to the neighborhood of Danville, Virginia, where they purchased liquor and became intoxicated. While in this condition Harrison and one of the boys got out of the car to get more liquor and Harrison permitted Going with the other boy to drive the car away to Danville to learn what plays were being shown at moving picture houses in the town and to return so that the party might decide what picture they wanted to see. At the time Going was intoxicated to Harrison's knowledge and not competent to drive the car; and on the way back from Danville a collision with another car was caused by Going's reckless driving, and the plaintiff's decedent and Going's companion were killed.

\*    \*    \*    \*    \*    \*

"We think, too, that the liability of Henry Harrison was covered by the policy under the North Carolina law, since he was 'responsible for the use' of the car and his wrongful act in permitting it to be used by an intoxicated companion resulted in the fatal collision."

In Travelers' Indemnity Co. v. Neal, 4 Cir., 176 F.2d 380, 384, we said:

"In brief, we have here the case of a master voluntarily (it would seem almost gladly) giving possession of a motor car to a tried and trusty servant (as had often been done before) for the purely social (and altogether laudable) purpose of enabling the servant to take his wife to church at Kenbridge, with a caution that the car must be back by one o'clock, since the master would need it at that time. After the wife was deposited in the Kenbridge church, the servant embarked upon a variant (but strictly similar) social mission of driving his wife's brother to Cedar Creek Church, though 'a little out of the way,' when the fatal accident occurred."

We sustained a verdict of the jury that the car was, at the time of the accident, being used with the "implied permission" of the owner.

In American Automobile Insurance Co. v. Fulcher, 4 Cir., 201 F.2d 751, we sustained a finding in favor of "implied permission." The owner was in jail and his brother was driving the car to the mother's home to arrange for her presence at the owner's trial. In this case we said, which bears on the instant case, 201 F.2d at page 756:

"It is also evident that, to support liability predicated upon implied permission, it is not necessary that the owner of the automobile be aware of the identity of the person operating it. Robinson v. Fidelity & Casualty Co. of New York, 190 Va. 368, 57 S.E.2d 93; or know of the particular use being made of it at the time of the accident. Liberty Mutual Insurance Co. v. Tiller, 189 Va. 544, 53 S.E.2d 814."

Cf. the opinion of District Judge Pollard in Jones v. New York Casualty Co., D.C., 23 F.Supp. 932; the opinion of District Judge Barksdale in Farm Bureau Mutual Automobile Insurance Co. v. Preferred Accident Insurance Co., D.C., 78 F.Supp. 561.

We can discuss only very briefly the various cases cited by counsel on both sides on various aspects of the instant case. Thus, as to what constitutes a question for the jury, counsel for appellants cite Sartor v. Arkansas Natural Gas Corporation, 321 U.S. 620, 64 S.Ct. 724, 88 L.Ed. 967; Tennant v. Peoria, etc., Railway Co., 321 U.S. 29, 64 S.Ct. 409, 88 L.Ed. 520. For the doctrine that insurance policies must be construed liberally in favor of the insured and against the insurer, these same counsel cite Williams v. Ornamental Stone Co., 232 N.C. 88, 59 S.E.2d 193; Gould Morris Electric Co. v. Atlantic Fire Insurance Co., 229 N.C. 518, 50 S.E.2d 295. On the "omnibus clause" our attention

is called to Virginia Auto Mutual Insurance Co. v. Brillhart, 187 Va. 336, 46 S.E.2d 377, 380; Ryan v. Maryland Casualty Co., 173 Va. 57, 3 S.E.2d 416; Peterson v. Maloney, 181 Minn. 437, 232 N.W. 790; Hurley v. Flannagan, 313 Mass. 567, 48 N.E.2d 621. See, also, 40 Am.Jur. 224; Appleman, "Insurance Law and Practice," Vol. 7, § 4367, page 172; Appleman, "Automobile Liability Insurance," pages 127–134; Vol. 32, Words and Phrases, p. 147.

Among the cases stressed by appellees are Samuels v. American Automobile Insurance Co., 10 Cir., 150 F.2d 221, 160 A.L.R. 1191; Employers Casualty Co. v. Williamson, 10 Cir., 179 F.2d 11; United States Fidelity & Guaranty Co. v. Mann, 4 Cir., 73 F.2d 465; Hinson v. Virginia-Carolina Chemical Corporation, 230 N.C. 476, 53 S.E.2d 448; Cypert v. Roberts, 169 Wash. 33, 13 P.2d 55; Mycek v. Hartford Accident & Indemnity Co., 128 Conn. 140, 20 A.2d 735; Byrne, for Use of King v. Continental Casualty Co., 301 Ill.App. 447, 23 N.E.2d 175.

In this welter of cases, we find varying and often conflicting views, which we do not attempt to reconcile. To paraphrase the ancient Latin maxim, "So many judges, so many opinions."

■■ Our own decisions, we think, show a strong tendency toward a liberal interpretation, in favor of the insured, of the "omnibus clause." This clause should not be construed and applied, from a purely analytical viewpoint, under a literal interpretation of the words of the policy. The spirit, not the letter, should control. Statutes requiring the insertion of the "omnibus clause" in automobile liability policies reflect a clear cut policy to protect the public. They should be construed and applied so as to carry out this policy.

Our case presents a number of questions which must be solved against a broad background of rather intimate social, family and business relations of the persons involved. Under the emergency created by the sudden illness of Payne, could his wife give possession of the car to Chatfield, so that it could be said that Chatfield was driving the car with Payne's implied permission? If so, did that implied permission cease when Chatfield returned to Franklinton after his trip to Wake Forest? Was the trip to the cabin to see Catlett really on Payne's business, in spite of Chatfield's denial? If the cabin trip had no connection with the business of Payne, could it be called an immaterial deviation which might be considered as coming within Mrs. Payne's authorization of Chatfield's use of the car?

Again, appellants' counsel raise another point. They insist that here Payne, Mrs. Payne and Chatfield are cooperating with the insured, upon the theory that the Payne group fear that if implied permission on Payne's part for the use of the car at the time of the collision be sustained, this would tend to establish Payne's liability in the civil suits pending against him. The damages claimed in these suits exceed the coverage of the policy by approximately $100,000. If heavy damages in these civil actions should be recovered against Payne, he might lose his home, his theatre, his cafe and any other property he might own. The inference seems fair that Chatfield was comparatively poor.

In this connection, counsel for appellants attack the credibility of Chatfield's testimony that his trip to the cabin was not made with any purpose connected with Payne's business, and, particularly, Chatfield's evidence that after he met Catlett at the cabin, they did not discuss any matters connected with Payne's business and did not even mention Payne's sudden illness. Counsel urge upon us the improbability of this testimony in the light of these circumstances: Chatfield stated he expected to operate the projector that night; he had never taken these children out for a ride before; he drove three miles out on the main road and then over a dirt road to an isolated cabin. Under this set of facts, it is urged that the credibility of these witnesses, Payne, Mrs. Payne,

Chatfield and Catlett, should have been left to the jury.

In the light of all that appears above, we think the District Judge erred in deciding as a matter of law in favor of the insurer, the cardinal question involved in this case—whether, under the "omnibus clause" Chatfield was driving the Chevrolet with the implied permission of Payne. In our opinion, this question was peculiarly one for the jury.

The judgment of the District Court is, accordingly, reversed and the case is remanded to the District Court with instructions to grant a new trial and to submit to the jury the cardinal question involved, under proper instructions from the Court.

Reversed and Remanded for a New Trial.